Marilyn Kelly, J.
(dissenting). I concur with the majority that defendant satisfied the first and third prongs of the test for a fair-cross-section violation of the *633 Sixth Amendment under Duren v Missouri ,[1] However, I disagree that defendant failed to meet the second prong of Duren. Accordingly, I respectfully dissent from the majority’s decision to reverse the judgment of the Court of Appeals.
The Court of Appeals used existing law and, for the most part, applied it properly. The majority opinion imputes error where there is none. Worse, it sua sponte introduces a “disparity of risk” test not accepted by any court in the country. The analysis the majority has set forth today neither improves nor clarifies this area of the law.[2]
The majority concludes that the Court of Appeals erred in two ways when evaluating the second prong of Duren. First, it considered the representation of African-Americans only in defendant’s venire, not in multiple venires over time. Second, it misapplied our decision in People v Smith[3] by “effectively adopting] a bright-line rule in favor of the comparative-disparity test in all instances in which the population of the distinct group is small.”[4] With regard to the first contention, the majority does not make a persuasive case that the Court of Appeals erred. And the second allegation of error is based on an inaccurate statement of what the Court of Appeals did.
I generally agree with the majority that, under Duren, courts must consider the composition of venires *634 over time. The Court of Appeals considered the specific disparity in the composition of defendant’s venire when evaluating the second Duren prong. And it considered multiple venires over time when applying the third Duren prong.[5] I am not persuaded that this was erroneous.
Some of the authority the majority relies on undermines its conclusion. For example, if a distinctive group is not underrepresented in a defendant’s particular venire, there is no cognizable Sixth Amendment claim. Thus, a distinctive group’s underrepresentation in a defendant’s particular venire is a necessary component of a Sixth Amendment claim. Accordingly, the composition of a defendant’s particular venire must be examined at some point in the Duren analysis. Yet the majority’s approach effectively ignores it.[6]
Other cases that the majority cites do not conclusively demonstrate that the composition of multiple venires over time must be considered under the second Duren prong rather than the third. To the contrary, these cases seem to stand for the uncontroversial proposition that a defendant must show underrepresentation in multiple venires over time to satisfy the Duren test generally.[7] Indeed, one of the majority’s quotations from *635 Duren supports this analysis.[8] Moreover, cases not cited by the majority contradict its conclusion and suggest that multiple venires over time are relevant to the question of systematic exclusion rather than the question of underrepresentation.[9]
*636 Consequently, I do not agree with the majority that Duren stands for the proposition that “evaluating whether representation of a distinct group is fair and reasonable requires evaluating venire composition over time.”[10] Rather, I believe that evaluating whether systematic exclusion occurred requires looking for a pattern of underrepresentation over time. This makes sense because to show a constitutional flaw in a jury-selection system, a defendant must show that the system consistently leads to unrepresentative venires. Indeed, in general it is the consistency of the system’s failure to produce representative venires that proves systematic exclusion. [11]
Thus, the Court of Appeals did not err by using the comparative disparity in defendant’s venire — 73.1 percent — when applying the second prong of Duren[12] And it appropriately evaluated the disparity in the racial composition of venires over time when applying *637 the third Duren prong. The majority’s first assignment of error is therefore without merit.
The majority’s second criticism of the Court of Appeals’ opinion is that it supposedly established “a bright-line rule favoring the comparative-disparity test” and disregarded the results of the other tests.[13] Respectfully, I believe that the majority misreads or mischaracterizes the Court of Appeals’ opinion.
The Court of Appeals did consider the results of both the absolute-disparity test and the standard-deviation test, but found both unhelpful to resolving defendant’s appeal.[14] The majority determines that this was error, but offers little explanation why this is so. It repeats that Smith mandated that courts consider the results of all the tests when determining whether the second prong of Duren is met. But the Court of Appeals specifically recognized that Smith requires such an approach and did analyze the results of each test. It simply found the results of one test — the comparative-disparity test — most helpful. It does not follow that because the Court of Appeals ultimately settled on one test as most meaningful, it relied on that test without considering the others. Nothing supports the majority’s sweeping assertion that the Court of Appeals established a bright-line rule in favor of the comparative-disparity test.
*638 Moreover, in what respect does the majority think that the Court of Appeals should have further “regarded” the results of the absolute-disparity test? The panel correctly recognized that if the absolute-disparity test controlled, a successful Sixth Amendment fair-cross-section challenge would be impossible in cases like this one in which the minority population is small. Even the expert who testified at the evidentiary hearing concluded that an analysis of absolute disparity is not a viable method of measuring underrepresentation in this case. Thus, I cannot see what further insight the majority believes that the Court of Appeals should have divined from the results of the absolute-disparity test.
When discussing the results of the standard-deviation test, the majority makes precisely the same error that it accuses the Court of Appeals of making. It notes the flaws in the standard-deviation test and decides to “afford the result of this test no weight.”[15] It does so notwithstanding Smith’s mandate that courts consider the results of all three tests. This inconsistency highlights why the majority’s criticism of the Court of Appeals in this respect is misplaced. Smith may mandate consideration of the results of all tests, but it does not dictate that a court give no more weight to one test than another. The Court of Appeals properly considered the results of all tests, but decided that the comparative-disparity test was “the most appropriate test to measure underrepresentation in this case.”[16]
Finally, I cannot agree with the majority’s importation of a fourth test — its disparity-of-risk test — into this appeal. First, no party or amicus curiae mentioned the disparity-of-risk test, let alone requested that we adopt it. Thus, the test was not properly considered by the *639 parties or the courts below.[17] Second, as the majority notes, its test has yet to garner approval from a single court as a viable means to test Sixth Amendment fair-cross-section claims. Despite these shortcomings, the majority sua sponte adopts it, applies it to this case, and declares that a violation occurs under that test when the disparity of risk exceeds 50 percent. The majority’s decision to do so absent any advocacy, let alone vigorous advocacy, on the issue is highly questionable.
I believe that my analysis dispels the majority’s findings of error by the Court of Appeals and demonstrates that the Court of Appeals correctly analyzed this case. The majority’s sole remaining basis for reversing the Court of Appeals’ judgment is its disagreement with that court’s reliance on People v Hubbard (After Remand.j.[18] I disagree that Hubbard should be partially overruled.
Under Hubbard, a court may consider the reason for a systematic exclusion when deciding whether representation of the distinctive group was fair and reasonable. If a jury-selection process systematically excludes a distinctive group on the basis of nonbenign factors, a court may give a defendant the benefit of the doubt on underrepresentation.[19] Hubbard borrowed this approach from United States v Biaggi[20] and United States v Osorio.[21] Although Biaggi and Osorio are not binding on this Court, they are persuasive. Moreover, contrary *640 to the majority’s conclusion that this approach “vitiates the three-part analysis,”[22] other courts have endorsed an analysis that merges the second and third Duren prongs in this fashion.[23]
Accordingly, I would follow Hubbard, as Justice CAVANAGH advocated in his concurring opinion in Smith.[24] Thus, I give defendant “the benefit of the doubt on underrepresentation” and “glance ahead” to the third Duren prong.[25] Unlike the defendant in Smith, defendant here has established that systematic exclusion occurred because the computer error that caused the exclusion was “inherent” in the jury-selection process used. As in Hubbard, the exclusion “did not result from ‘benign’ random selection, but, instead, resulted from a defect inherent in the juror allocation process . . . .”[26]
Because defendant established that systematic exclusion occurred and “the showing of underrepresentation is close,”[27]1 conclude that defendant has established a prima facie violation of the Sixth Amendment’s fair-cross-section requirement. The prosecution identifies no significant state interest that was advanced by the selection process that systematically excluded African- *641 Americans from Kent County venires. Thus, defendant’s Sixth Amendment claim should prevail.
Finally, we must not lose sight of the fact that the right at issue here — the right to a jury trial — is the cornerstone of the American justice system.[28] The right-to be adjudged by a jury of one’s peers is a precious part of that right.[29] The majority’s careless decision imposes a new, wholly unnecessary restriction on this right by creating error where there is none and new law that no party has advocated.
For these reasons, I believe that the Court of Appeals correctly reversed defendant’s convictions and remanded for a new trial. I would affirm its judgment.
Hathaway, J., concurred with Marilyn Kelly, J.

 Duren v Missouri, 439 US 357, 364; 99 S Ct 664; 58 L Ed 2d 579 (1979).

 It is also altogether unnecessary. The error in the jury-selection process at issue here occurred between June 2001 and August 2002 as a result of a computer programming error. Accordingly, the number of cases raising this issue that remain in the appellate pipeline is likely low. The majority’s decision today is dressed-up error correction, pure and simple.

 People v Smith, 463 Mich 199; 615 NW2d 1 (2000).

 Ante at 582-583.

 People v Bryant, 289 Mich App 260, 273-275; 796 NW2d 135 (2010) (applying the third Duren prong using data and statistics for venires over a three-month period).

 The majority asserts that its approach takes defendant’s venire into account by “including it in the data set of venires used to calculate the degree of underrepresentation.” Ante at 601 n 63. But disparity in the composition of a defendant’s particular venire must be shown in order to demonstrate that the defendant was harmed because a constitutional violation actually occurred. Accordingly, the disparity in that particular venire must be considered independently, not simply lumped in with statistics concerning other venires.

 See, e.g., United States v Miller, 771 F2d 1219, 1228 (CA 9, 1985) (“[A] violation of the fair cross-section requirement cannot be premised upon *635 proof of underrepresentation in a single jury.”) (emphasis added); United States v Allen, 160 F3d 1096, 1103 (CA 6, 1998) (“Appellants have satisfied the first prong [of] the Duren test, hut they have not satisfied the other two.”) (emphasis added). The majority asserts that Duren itself “compels” the majority’s analysis of the second prong. Ante at 599-600. However, the quotations from Miller and Allen, coupled with the authority that I cite in footnote 9, demonstrate that courts have not applied Duren with precision. Thus, the majority’s analysis is far from a foregone conclusion. It is also telling that the majority identifies few cases decided since 1979 that attribute such significance to the use of the plural “venires” in Duren’s discussion of the second-prong analysis. The reliance in these cases on the use of the plural is also undercut by statements in subsequent caselaw from the United States Supreme Court. See, e.g., Holland v Illinois, 493 US 474, 478, 480; 110 S Ct 803; 107 L Ed 2d 905 (1990) (“It has long been established that racial groups cannot be excluded from the venire from which a jury is selected____[A] fair-cross-section venire requirement is imposed by the Sixth Amendment[.]”) (emphasis added).

 See ante at 600, quoting Duren, 439 US at 366 (“Finally, in order to establish a prima facie case, it was necessary for petitioner to show that the underrepresentation of women, generally and on his venire, was due to their systematic exclusion in the jury-selection process.”) (emphasis added).

 State v Bowman, 349 NC 459, 469; 509 SE2d 428 (1998) (noting in its discussion of the third Duren prong that the “[defendant’s only evidence in the instant case consisted of the statistical makeup of this particular jury venire” and that “[statistics concerning one jury pool, standing alone, are insufficient to meet the third prong of Duren”)-, State v Holland, 2009 Me 72, ¶ 39; 976 A2d 227, 239 (2009) (concluding that the defendant failed to meet the third Duren prong because “it is unknown how many African-Americans were in any jury pool other than [the defendant’s]”); United States v DeFries, 327 US App DC 181, 189; 129 F3d 1293 (1997) (“Underrepresentation of a cognizable group in a single venire, without evidence of a greater pattern, is insufficient to establish the ‘systematic exclusion of the group’ required by Duren .. . .”) (emphasis added); United States v Hardwell, 80 F3d 1471, 1486 (CA 10, 1996) (“[Defendant] has not shown that under-representation of African-Americans on his jury venire was the result of systematic exclusion, hut simply argues that systematic exclusion can be *636 inferred from the under-representation in a single venire. This argument is without merit.”); United States v Jones, 687 F2d 1265, 1269 (CA 8, 1982) (“Even assuming that the first two requirements have been met, there is no evidence of systematic exclusion in the jury selection procedure.... No evidence was introduced regarding the composition of other venires in the district.”).

 Ante at 602.

 Duren, 439 US at 366 (“[T]hat a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic .. . .”).

 Other courts also examine the disparity between the racial composition of the community and the composition of the defendant’s venire when applying the second Duren prong. See, e.g., State v Hester, 324 SW3d 1, 42-44 (Tenn, 2010) (applying the second Duren prong by calculating the disparity between the racial composition of the county’s population and the racial makeup of the defendant’s venire); Bowman, 349 NC at 467-468 (same); Holland, 2009 Me at ¶ 31; 976 A2d at 237-238 (same).
In any event, for reasons explained later in this opinion, I conclude that defendant established a Sixth Amendment fair-cross-section violation even if I use the three-month comparative disparity of 49.4 percent.

 Ante at 606-607.

 See Bryant, 289 Mich App at 269 (concluding that “ ‘the absolute disparity test is an ineffective measure of acceptable disparity’ because of the low percentage of African-Americans who were eligible to vote in Kent County” and for that reason “declining] to find the absolute-disparity test controlling in this case”), quoting People v Hubbard (After Remand), 217 Mich App 459, 477; 552 NW2d 493 (1996) (citation omitted); id. at 272-273 (“[I]n this case, the standard-deviation test has little value in measuring the underrepresentation of African-Americans in Kent County jury venires.”).

 Ante at 611.

 Bryant, 289 Mich App at 271.

 Because the propriety of this test is not properly before us, I decline the majority’s invitation to indulge in a substantive critique of it. See ante at 37 n 103.

 Hubbard, 217 Mich App 459.

 Id. at 478, 481.

 United States v Biaggi, 909 F2d 662, 678 (CA 2, 1990).

 United States v Osorio, 801 F Supp 966 (D Conn, 1992).

 Ante at 618.

 United States v Rioux, 930 F Supp 1558, 1566 (D Conn, 1995) (“[T]he second and third prongs of the Duren test, unfair representation and systematic exclusion, are intertwined inextricably.”); Commonwealth v Arriaga, 438 Mass 556, 566; 781 NE2d 1253 (2003) (“Evidence of a disparity smaller than 10% can support a conclusion of unconstitutional underrepresentation of smaller minority groups, especially when coupled with persuasive evidence of systematic exclusion.”) (emphasis added).

 Smith, 463 Mich at 222-224 (CAVANAGH, J., concurring).

 Id. at 224.

 Hubbard, 217 Mich App at 481.

 Smith, 463 Mich at 222 (Cavanagh, J., concurring); see also id. at 219 (identifying comparative disparities as large as 40 percent as “borderline”).

 “Just as suffrage ensures the people’s ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary.” Blakely v Washington, 542 US 296, 306; 124 S Ct 2531; 159 L Ed 2d 403 (2004).

 “Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.” Duncan v Louisiana, 391 US 145, 156; 88 S Ct 1444; 20 L Ed 2d 491 (1968).